IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ARQUATI, S.R.L., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:10-CV-0152 -N |
| | § | |
| CORRADI USA, INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

## **ORDER**

This Order addresses Defendants Corradi USA, Inc., Corradi S.P.A., EFFE.A International, LLC, Alberto Tanzi, Beatrice Arquati-Tanzi, and Ermes Sani's (collectively, the "Corradi Defendants") motion to dismiss [30] and Defendant Universal Wood Moulding, Inc.'s, ("Universal") motion to dismiss [45]. For the following reasons, the Court grants in part and denies in part the Corradi Defendants' motion. And, because Texas law does not recognize the Plaintiffs' (collectively, "Arquati") trademark conversion claim, the Court grants Universal's motion.

### I. ORIGINS OF THE AQUATI-CORRADI DISPUTE

This case concerns a trans-Atlantic dispute involving several Italian commercial entities, their U.S. subsidiaries, and at least three of the entities' executives. Arquati S.R.L. ("Arquati Italy") "design[s], manufacture[s] and s[ells] . . . products including: (i) mouldings; (ii) solar protection products (*e.g.*, awnings, solar screens and shades, patio covers, shades, curtains, and blinds); and (iii) outdoor furniture." Second Am. Compl. at 5 [43]. Arquati

Italy claims that its products are trademarked and "are sold . . . through its authorized distributors and licensees," including the Arquati Company USA, Inc., ("Arquati USA") Arquati Italy's "wholly-owned [U.S.] subsidiary" located in Carrollton, Texas. *Id.*

In the summer of 2009, Arquati Italy initiated liquidation proceedings under Italian law. Defendant Ermes Sani ("Sani") served as Arquati Italy's liquidator. Sani and several others tasked with restructuring Arquati Italy decided to sell off Arquati USA as part of Arquati Italy's reorganization. Defendants Alberto Tanzi and Beatrice Arquati-Tanzi (collectively, the "Tanzis"), then the President and Vice-President of Arquati USA, offered to purchase Arquati USA. Arquati Italy declined because it believed the Tanzis offered an insufficient purchase price. Sani nonetheless continued to negotiate the sale of Arquati USA and its operations with both the Tanzis and Universal in an attempt to procure a total purchase price that sufficiently reflected Arquati Italy's valuation of Arquati USA.

Arquati Italy's shareholders eventually replaced Sani, but the newly elected liquidator decided to keep Sani in a limited capacity to complete the spinoff of Arquati USA's assets. To further that process, Arquati Italy's leadership decided to send Sani to the United States as Arquati Italy's emissary and gave him power of attorney to "(i) obtain the resignation of [Alberto Tanzi]; (ii) assume control as President and Managing Director of Arquati USA, and (iii) 'implement all the operations aimed at the sale of' Arquati USA's assets." *Id.* at 9. Arquati Italy, however, claims that "at no time . . . was Sani told that he could act unilaterally and sell any assets of Arquati USA without the express approval of Arquati Italy." *Id.*

But, according to Arquati Italy, when Sani arrived in the United States, he instead colluded with the Tanzis, other Arquati USA officers, and others to transfer ownership of Arquati USA to Defendant Corradi S.P.A. ("Corradi Italy"), Arquati Italy's largest competitor. With Corradi Italy's assistance, Sani, the Tanzis, and others allegedly formed Corradi USA, Inc., ("Corradi USA") to serve as Corradi Italy's U.S. affilliate, which soon began operating out of Arquati USA's Carrollton headquarters using Arquati USA's assets. Without Arquati Italy's knowledge or permission, the Corradi Defendants then allegedly engaged in a series of transactions designed to inconspicuously cede ownership and control of Arquati USA, its assets, and rights to use the Arquati name and trademarks from Arquati Italy to Corradi Italy and Corradi USA. Simultaneously, Sani executed an agreement that ostensibly conveyed all of Arquati USA's moulding division to Universal.

Arquati Italy and Arquati USA then initiated this action, asserting twenty-two claims against the Corradi Defendants and Universal. The Corradi Defendants now challenge six of those claims concerning various iterations of conversion and conspiracy.[1] Separately, Universal also moves to dismiss one claim asserted against it, concerning conversion of the Arquati marks.

## II. RULE 12(b)(6) STANDARD

---

[1] The Corradi Defendants' motion to dismiss also challenges a seventh claim, for "rescission," which Arquati abandoned when it filed its second amended complaint. *See* First Am. Compl. at 42 [20].

When faced with a Rule 12(b)(6) motion to dismiss, the Court must determine whether the plaintiff has asserted a legally sufficient claim for relief. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). According to the Supreme Court, a viable complaint must include "enough facts to state a claim to relief that is plausible on its face," i.e., "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim or element]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009). A plaintiff is required to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citations omitted).

As the Supreme Court recently observed:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. [*Twombly*, 550 U.S.] at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.*, at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. [*Iqbal v. Hasty*,] 490 F.3d 143, 157-158 [(2d Cir. 2007)]. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged – but it has not "show[n]" – "that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).

> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal*, 129 S. Ct. at 1949-50.

In ruling on a Rule 12(b)(6) motion, the court limits its review to the face of the pleadings, accepting as true all well-pleaded facts and viewing them in the light most favorable to the plaintiff. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

### III. ARQUATI DOES NOT STATE A CLAIM FOR CONVERSION OF REAL PROPERTY

In their first line of attack, the Corradi Defendants argue that the Court must dismiss Counts VIII and IX of Arquati's complaint to the extent that they state claims for, respectively, conversion of real property and conspiracy to convert real property. Defs.' Mot. to Dismiss at 2-3; *see also* Defs.' Reply at 3-4 [44]. The Corradi Defendants contend that Texas law "does not recognize a cause of action for conversion of real property," Defs.' Mot. to Dismiss at 2, and, "because conspiracy cannot exist in the absence of an underlying wrong," *id.* at 3, that Arquati's conspiracy-related claim must fail.[2]

---

[2]The Court refers to the claims as numbered in Arquati's second amended complaint. The Corradi Defendants filed their reply after Arquati filed its second amended complaint and specifically noted that they believed the newly revised complaint did not alter the motion to dismiss's analysis. Defs.' Reply at 1 n.1 ("Aside from removing John Mares as a potential defendant, Plaintiffs' Second Amended Complaint makes no other substantive changes. Accordingly, Defendants' Motion remains ripe.").

ORDER – PAGE 5

The Corradi Defendants correctly note that Arquati cannot sustain claims for the conversion of real property under Texas law. *See, e.g.*, *Cage Bros. v. Whiteman*, 163 S.W.2d 638, 641 (Tex. 1942). Nowhere on the face of Count VIII, however, does Arquati specifically state such a claim. Rather, as the Corradi Defendants apparently concede, *see* Defs.' Reply at 3,[3] Arquati states a claim for conversion of personal property under Texas law. *See, e.g.*, *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971) (defining conversion as "[t]he unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights" (citing *Am. Surety Co. of N.Y. v. Hill County*, 254 S.W. 241 (Tex. Civ. App. – Dallas 1923, writ granted), *aff'd*, 267 S.W. 265 (Tex. 1924))).

To that end, Arquati alleges that Corradi USA "assumed dominion and control over Arquati USA's property," without permission, "and continues to deprive Arquati USA of possession of its property." Second Am. Compl. at 24. Arquati further alleges that "Corradi USA took over Arquati USA's headquarters and property when it still belonged to Arquati USA, and subsequently acquired Arquati USA's property and assets through a sham transaction." *Id.* According to Arquati, the Corradi Defendants have been notified that they possess Arquati's property, but they nonetheless refuse to return it. *Id.*

---

[3]"Plaintiffs mischaracterize Defendants' argument. Defendants do not argue that Plaintiffs only allege conversion of real property in Count VIII. Rather, Defendants simply move to dismiss the conversion claim in Count VIII as it relates to the real property of Arquati USA's headquarters." Defs.' Reply at 3.

The mere assertion that the Corradi Defendants took over Arquati USA's headquarters does not state a claim for conversion of real property, and the Court does not read these factual allegations to implicitly advance such a claim. Furthermore, Arquati explicitly disavows any intention of stating a claim for conversion of real property. In its response, Arquati asserts that it alleges conversion only of personal property, including assets such as "'inventory, equipment, machinery, client lists, accounts receivables, and other property.'" Pls.' Resp. at 3 [38] (quoting Second Am. Compl. ¶ 34). The Court sees no reason to doubt Arquati's averment.

Because the complaint does not contain a claim for conversion of real property, the Court rejects the Corradi Defendants' argument and leaves Count VIII intact. Accordingly, the Corradi Defendants' arguments against Arquati's conspiracy claim in Count IX fail because they necessarily depend on this Court finding that Arquati improperly brings a claim for conversion of real property.[4]

**IV. TEXAS LAW DOES NOT RECOGNIZE CLAIMS FOR TRADEMARK CONVERSION**

Arquati alleges that the Corradi Defendants and Universal "have used the ARQUATI® Marks unlawfully on products that are not genuine ARQUATI® Products" and also on websites. Second Am. Compl. at 15. Among several trademark-related claims, including trademark infringement and cybersquatting, Arquati brings claims for conversion

---

[4]Because the Corradi Defendants argue that Count IX should be dismissed only because a claim for "conspiracy cannot exist in the absence of an underlying wrong," Mot. to Dismiss at 3, the Court does not address whether Arquati fails to state a claim for conspiracy to convert personal property.

of the Arquati marks against both Corradi USA and Universal in, respectively, Counts XI and XIV. *Id.* at 27, 29-30. According to Arquati, the Corradi Defendants and Universal "unlawfully and without authority assumed dominion and control over the ARQUATI® Marks, and ha[ve] deprived and continue[] to deprive Arquati Italy of possession of its property." *Id.* at 27, 30. Additionally, Arquati alleges conspiracy to convert the Arquati marks in part of Count XII against all of the Corradi Defendants, but not Universal. *Id.* at 27-28. The Corradi Defendants and Universal contend that these claims must fail under Rule 12(b)(6) because Texas law precludes claims for the conversion of intangible property, including intellectual property, except in very narrow circumstances not applicable here.

Although the Court acknowledges that this area of law continues to evolve,[5] the overwhelming weight of authority counsels against recognizing the type of conversion claim Arquati asserts here. The Fifth Circuit has expressly held that "intellectual property rights" cannot serve as the basis for a claim under "Texas conversion law" because it "concerns only physical property." *Carson v. Dynegy, Inc.*, 344 F.3d 446, 456 (5th Cir. 2003) (copyright) (citing *Waisath*, 474 S.W.2d at 447). With one exception, every examined federal district

---

[5]*See Staton Holdings, Inc. v. First Data Corp.*, 2005 WL 1164179, at *5-6 (N.D. Tex. 2005) (Solis, J.) (observing that, although conversion claims have been limited historically to tangible property, recent cases have "'relax[ed]' the rule to allow actions for conversion of intangible personal property rights in limited circumstances" (citing *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1569 (S.D. Tex. 1996)))

court to consider the issue has agreed,[6] and, although the Supreme Court of Texas has not specifically addressed the question,[7] the Texas intermediate appellate courts have concurred.[8]

Although "Texas law has never recognized a cause of action for conversion of intangible property" per se, however, courts have carved out a very limited exception for "cases where an underlying intangible right has been merged into a document and that

---

[6]*See Quantlab Technologies Ltd. (BVI) v. Godlevsky*, 2010 WL 2593669, at *8-9 (S.D. Tex. 2010) (information and trade secrets) (publication pending); *Entm't Merch. Tech., LLC v. Houchin*, 2010 WL 1286540, at *6 (N.D. Tex. 2010) (McBryde, J.) (patent); *WesternGeco v. Ion Geophysical Corp.*, 2009 WL 3497123, at *3 (S.D. Tex. 2009) (information used in patent application); *Xpel Technologies Corp. v. Am. Filter Film Distribs.*, 2008 WL 3540345, at *5 (W.D. Tex. 2008) (trade secrets); *Sefton v. Jew*, 201 F. Supp. 2d 730, 750-51 (W.D. Tex. 2001) (service marks used in domain name); *CICCorp. Inc. v. Aimtech Corp.*, 32 F. Supp. 2d 425, 430 n.9 (S.D. Tex. 1998) ("internet webpage address"); *Neles-Jamesbury, Inc. v. Bill's Valves*, 974 F. Supp. 979, 981-82 (S.D. Tex. 1998) (trademark); *Pebble Beach*, 942 F. Supp. 1513, 1569 (S.D. Tex. 1996) (appearance of golf course as depicted in a videotape), *aff'd and modified by*, 155 F.3d 526 (5th Cir. 1998); *accord Sanitec Indus. v. Micro-Waste Corp.*, 2006 WL 3455000, at *41 (S.D. Tex. 2006). *But see Staton*, 2005 WL 1164179, at *5-6 (phone number).

[7]*See United Mobile Networks, L.P. v. Deaton*, 939 S.W.2d 146 (Tex. 1997) (conversion of customer list); *Prewitt v. Branham*, 643 S.W.2d 122, 123 (Tex. 1982) (intangible rights under a lease, when the lease had been converted). The Supreme Court of Texas, in a case of very limited scope, considered the unauthorized copying and dissemination of computer source code as a misappropriation of trade secrets claim. *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453 (Tex. 1996) (answering questions certified by the Fifth Circuit concerning applicability of a discovery exception to Texas's general two-year statute of limitations).

[8]*See, e.g.*, *Express One Int'l, Inc. v. Steinbeck*, 53 S.W.3d 895, 900-01 (Tex. App. – Dallas 2001, no pet.) (trade name); *accord OXY USA, Inc. v. Sw. Energy Prod. Co.*, 161 S.W.3d 277, 284 (Tex. App. – Corpus Christi 2005, pet. den.) (observing that "Texas recognizes conversion of intangible property where the underlying intangible right has been merged into a document and that document has been converted") (citing *Express One*, 53 S.W.3d at 901); *Westlake Surgical, L.P. v. Turner*, 2009 WL 2410276, at *3 n.1 (Tex. App. – Austin 2009, no pet.) (noting that Texas law does allow conversion of trade secrets claims that are based on the conversion of tangible property) (collecting cases).

ORDER – PAGE 9

document has been converted." *Express One Int'l, Inc. v. Steinbeck*, 53 S.W.3d 895, 901 (Tex. App. – Dallas 2001, no pet.) (citing *Neles-Jamesbury, Inc. v. Bill's Valves*, 974 F. Supp. 979, 982 (S.D. Tex. 1997)); *see also Prewitt v. Branham*, 643 S.W.2d 122, 123 (Tex. 1982) ("The lessee's rights under a lease are treated in law as personal property. The conversion of the document in which the rights had been merged supports a conversion action for the value of the rights represented by it.").[9] Beyond leases, the exception also has been applied to cases involving other tangible property such as customer lists and stock certificates. *Neles-Jamesbury*, 974 F. Supp. at 982 (citing *United Mobile Networks, L.P. v. Deaton*, 926 S.W.2d 756 (Tex. App. – Texarkana 1996), *rev'd in part on other grounds*, 939 S.W.2d 146 (Tex. 1997)); *Watts v. Miles*, 597 S.W.2d 386, 387-88 (Tex. App. – San Antonio 1980, no writ)); *accord Consortium Info. Servs., Inc. v. Nat'l Info. Servs., Inc.*, 2001 WL 1516758, at *6 (N.D. Tex. 2001) ("Texas law does recognize a cause of action for conversion of a customer list." (citing *Neles-Jamesbury*, 974 F. Supp. at 981; *United Mobile*, 939 S.W.2d at 148)).

Beyond these limited exceptions, however, the general rule against recognizing claims for conversion of intangible property cited by the Fifth Circuit in *Carson* remains valid.

---

[9]There appears to be some disagreement over the extent to which Texas has adopted the merger requirement. The *Staton* Court concluded that "Texas has not expressly adopted the Restatement's 'merged with' requirement," but the court's research uncovered only cases that applied the merger rule or assumed its existence. *See* 2005 WL 1164179, at *5-6 & n.2 (citing various cases and annotations to the RESTATEMENT SECOND OF TORTS § 242 (1965)). Another federal court considering a similar claim recently observed that Texas does adhere to the merger requirement. *Quantlab*, 2010 WL 2593669, at *9 ("[The Plaintiff] has not cited any Texas case law disposing of the merger requirement, nor is the Court aware of any.").

Indeed, the Court found only one case that allowed a claim for conversion of intangible property to proceed under Texas law without some showing that the intangible property manifested itself in some document or other form of tangible property that had been converted. *See Staton Holdings, Inc. v. First Data Corp.*, 2005 WL 1164179, at *6 (N.D. Tex. 2005) (Solis, J.) (allowing conversion claim to proceed for a phone number because it was of "immense (potential) value to Plaintiffs and others" and noting that in so ruling the court did not "suggest[] that all telephone numbers may be subject to a cause of action for conversion").

Arquati hinges its trademark conversion claim on this exception and argues that a Texas intermediate appellate court case supports applying the exception here. *See OXY USA, Inc. v. Sw. Energy Prod. Co.*, 161 S.W.3d 277, 284 ( Tex. App. – Corpus Christi 2005, pet. den.). The Court remains unpersuaded.

In *OXY*, several business entities entered into a series of agreements and transactions concerning seismic surveys for an oil and gas project that, for various reasons, ended in complex litigation. OXY and the Southwest Energy Production Company ("SEPCO") agreed to develop a project under which both parties would acquire certain leasing and licensing rights. Without OXY's knowledge, however, SEPCO had already executed a marketing agreement with another entity, the Skelly Exploration Company ("Skelly"), which granted SEPCO a license to use seismic data generated by the SEPCO-Skelly venture. SEPCO also contracted with another entity, Seitel Data Limited ("Seitel"), to buy seismic

data licenses that were ostensibly reserved for both Skelly and OXY (the "Seitel Agreement").

OXY eventually learned of SEPCO's dealings with Skelly and Seitel and threatened to withdraw from the project unless SEPCO renegotiated the Seitel Agreement to provide that only OXY would receive a seismic data license. SEPCO agreed and executed a new agreement between itself, OXY, and Seitel – excluding Skelly. In a separate agreement, SEPCO also pledged to indemnify OXY against any claims that Skelly might assert against OXY for its role in instigating the second agreement between Seitel and SEPCO.

When Skelly later sued OXY for, among other things, conversion of Skelly's rights under the Seitel Agreement, however, SEPCO reneged on the indemnity agreement. OXY then settled with Skelly and sued SEPCO for breaching its indemnity obligations. SEPCO argued in response that some of Skelly's claims, including for conversion, did not fall within the indemnity agreement because they accrued after its execution. *See* 161 S.W.3d at 280-82, 284. It was this argument that the *OXY* Court specifically addressed in the discussion that Arquati contends supports it trademark conversion claim. *Id.* at 284.

SEPCO did argue on appeal that Skelly's anticipated "contractual grant of a license in the Seitel Agreement was merely an intangible right, and therefore, could not be the basis of the conversion claim." *Id.* The court, however, rebutted this argument by citing both *Express One* and *Neles-Jamesbury* for the proposition that conversion does lie under Texas law when a document containing a merged intangible right has been converted. *Id.* In that regard, the court recognized that "Skelly's right to a license was not merely an intangible

right, but was a right merged into the Seitel Agreement." *Id.* Arquati seizes on this language and draws a direct analogy to the facts of this case, arguing that its trademark conversion claim should stand because it "allege[s] that the trademark rights converted by the [Corradi] Defendants and others had been embodied in the License Agreement [between Arquati Italy and Arquati USA], which had been converted when such rights were fraudulently conveyed to the [Corradi] Defendants and others." Pls.' Resp. at 6.

Critically, however, the *OXY* Court never held that the original agreement between SEPCO and Seitel had itself been converted. And, the court expressly noted that it made no decision on whether Skelly's conversion claim had merit. 161 S.W.3d at 284. Rather, it ruled that such a claim, were it to exist, arose upon Skelly's exclusion from the agreement between SEPCO, OXY, and Seitel and thus predated the indemnity agreement between OXY and SEPCO. *Id.* Thus, despite the Corradi Defendants' argument implying otherwise, *OXY*'s discussion of the merger requirement and intangible property exception served only to determine whether Skelly's conversion claim was barred by the indemnity agreement's timing – not whether that claim had merit.[10]

---

[10]Furthermore, the facts in *OXY* do not inexorably lead to Arquati's desired interpretation. Had the *OXY* Court decided the conversion claim's merits, the text of the opinion plausibly suggests that the court would have rejected it. Although it noted that Skelly's licensing rights had been merged into the Seitel Agreement, the court did not specifically say that Skelly ever claimed that the agreement had been converted. Instead, the opinion observes that, in its underlying action against OXY, Skelly "claimed [it] 'owned an interest and/or w[as] entitled to possession of such [seismic] data through a license pursuant to the Seitel Agreement' and that 'OXY unlawfully . . . exercised dominion over the 3-D seismic data to the exclusion of/or inconsistent with the rights of [Skelly].'" 161 S.W.3d at 284.

This suggests two possible grounds for rejecting the conversion claim in *OXY*. First,

Regardless of how one interprets *OXY*, however, it ultimately provides too slender a reed to support Arquati's trademark conversion claims. Even if the Court gave *OXY* Arquati's preferred reading, it would stand as an outlier to almost two decades of jurisprudence disallowing similar claims. *See supra* p.9 nn.6, 8 (collecting cases); *Neles-Jamesbury*, 974 F. Supp. at 981-82 (rejecting trademark infringement claim characterized as one for conversion); *Express One*, 53 S.W.3d at 900-01 (rejecting claim for trade name conversion). And, although the Court must look to the Texas courts for guidance, *OXY* does not control the Court's decision here. *See Rogers v. Corrosion Prods., Inc.*, 42 F.3d 292, 295 (5th Cir. 1995) ("The decisions of lower state courts should be given some weight, but they are not controlling where the highest state court has not spoken on the subject" (citing *Comm'r of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 465 (1967))); *accord FDIC v. Abraham*, 137 F.3d 264, 268 (5th Cir. 1998) (noting the Fifth Circuit's "usual reluctance

---

if the sought-after data were represented in some physical form – the opinion does not say – Skelly could just as plausibly have been stating a permissible claim for conversion of tangible property. Skelly's reference to the Seitel Agreement, then, could have been merely to establish the ownership interest necessary for standing to bring a claim for conversion in the first instance; one cannot bring a claim for conversion of property that one does not own. *See, e.g.*, *Smith v. Maximum Racing, Inc.*, 136 S.W.3d 337, 341 (Tex. App. – Austin, 2004, no pet.) ("To establish a claim for conversion of personal property, a plaintiff must prove that: (1) the plaintiff owned or had legal possession of the property or entitlement to possession . . . .") (citations omitted).

Second, and more likely, Skelly could have been stating an impermissible claim for conversion of intangible property rights merged into property that, while tangible, had not been converted. In this view, although it would have served to establish the predicate ownership rights necessary for Skelly to assert its conversion claim, the Seitel Agreement also would have contained the seeds of the claim's demise. Unless the Seitel Agreement had been converted itself, the *OXY* Court probably would have rejected Skelly's conversion claim. Under either hypothetical, *OXY* lacks relevance to this dispute except to the extent it reaffirms the intangible property exception's existence.

to use the single holding of but one among a number of intermediate state courts of appeal as the foundation of an '*Erie*-guess' about how the highest court of the state might rule on a given issue of state law"). Thus, the Court sides with the weight of authority and holds that Texas law does not recognize claims for conversion of intangible intellectual property such as a trademark unless the intangible rights to that property have been merged into a document or some other tangible form of property that has itself been subject to conversion.

Arquati's trademark conversion claims must ultimately fail, then, because they do not meet this standard. Arquati correctly cites *OXY* as a case where the "plaintiff ha[d] properly alleged that the licensing a [sic] right was merged into the parties' agreement." Pls.' Resp. at 6. But, under Texas law, claiming that its trademark rights have been embodied or merged into a licensing agreement only gets Arquati halfway home. Nowhere does Arquati expressly claim that either the Corradi Defendants or Universal converted the actual, physical license agreement between Arquati Italy and Arquati USA. Instead, Arquati claims that the licensing agreement was converted when the "[*trademark*] *rights* were fraudulently conveyed to the [Corradi] Defendants and others," Pls.' Resp. at 6 (emphasis added). Accordingly, although Arquati characterizes the Corradi Defendants and Universal's actions as the "unauthorized and wrongful assumption and exercise of dominion and control" over the Arquati marks, those actions are "inconsistent with [Arquati's] rights" under trademark law. *Waisath*, 474 S.W.2d at 447. And, trademark and intellectual property law provides the appropriate remedies here, as Arquati recognizes by bringing separate claims for trademark infringement.

The Court, therefore, rules that Arquati fails to state a claim for trademark conversion in Counts XI and XIV. And, because part of Count XII depends on the Court finding that Arquati states a claim for an underlying wrong in Count XI, the Court further dismisses Count XII to the extent it states a claim for conspiracy to convert the Arquati marks.

### V. ARQUATI'S CONSPIRACY TO BREACH FIDUCIARY DUTY CLAIMS SURVIVE

The Corradi Defendants next challenge Counts XVIII and XX, both concerning conspiracy to breach fiduciary duty. *See* Second Am. Compl. at 36-37, 39. The Corradi Defendants concede that Arquati states underlying claims for breach of fiduciary duty, but contend that Arquati "fail[s] to plead any specific fact to support [its] conspiracy allegation[s]." Mot. to Dismiss at 5. Specifically, the Corradi Defendants argue that Arquati only makes the conclusory allegation that the "Defendants each agreed and conspired together," "a 'formulaic recitation of a cause of action's elements that will not do' under *Twombly*." *Id.* at 5-6.

Texas law "generally define[s]" civil conspiracy "as a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) (citing *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925 (Tex.1979)); *see also Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005) (listing five elements of civil conspiracy). The classic "meeting of the minds" serves as conspiracy's hallmark element. *See, e.g.*, *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex. 1969) (observing that "one without knowledge of a conspiratorial plan or scheme to injure another by the commission

of a particular wrong cannot share the intent to injure such other"). But, a plaintiff need not allege or provide direct evidence of a conspiracy; it may be shown by "facts and circumstances from which the natural inference arises that the [underlying] unlawful, overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators." *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581-82 (Tex. 1963) (collecting cases). As a derivative tort, a plaintiff cannot bring a claim for civil conspiracy without also alleging an underlying wrong. *Tilton*, 925 S.W.2d at 681. Texas law allows a breach of fiduciary duty claim to support a concomitant conspiracy claim. *See Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 207-208 (Tex. 2002); *Avary v. Bank of America, N.A.*, 72 S.W.3d 779, 792 (Tex. App. – Dallas 2002, pet. den.); *Lesikar v. Rappeport*, 33 S.W.3d 282, 302 (Tex. App. – Texarkana 2000, pet. den.) ("Types of torts or unlawful acts on which a cause of action for conspiracy may be based include breach of a fiduciary duty . . . ." (collecting cases)).

Based on the "facts and circumstances" alleged in the complaint as a whole, the Court finds that Arquati sufficiently states claims for conspiracy to breach fiduciary duty. In the complaint, Arquati claims that its emissary, a former director of Arquati Italy, worked with the directors of Arquati's U.S.-based affiliate to effect the affiliate's sale to two of Arquati's largest competitors through a series of "sham" transactions – all without Arquati Italy's knowledge or permission. These same alleged facts, which – as the Corradi Defendants concede – adequately support Arquati's breach of fiduciary duty claims, at least raise a

plausible inference that the Defendants knowingly acted in concert.  Accordingly, Arquati states valid claims for conspiracy to breach fiduciary duty in Counts XVIII and XX.

## CONCLUSION

Contrary to the Corradi Defendants' arguments, Arquati does not bring a claim for conversion of real property and does state claims for conspiracy to breach fiduciary duty.  Texas law, however, bars Arquati's trademark conversion claims.  Accordingly, the Court grants in part and denies in part the Corradi Defendants' motion to dismiss, and grants Universal's motion to dismiss.

Signed December 29, 2010.

_____
David C. Godbey
United States District Judge